**THE SERPA CORPORATION,
Plaintiff, Appellant,**

v.

**MCWANE, INC., Anaco, f/k/a Anaheim
Foundry Company and Tyler Pipe
Industries, Defendants, Appellees.**

**No. 99–1256.**

United States Court of Appeals,
First Circuit.

Heard Oct. 8, 1999.

Decided Dec. 8, 1999.

---

Mitchell A. Kramer, with whom Kramer & Friedman was on brief, for appellant.

Margaret A. Lange, with whom Lawrence G. Green, and Perkins, Smith & Cohen, LLP were on brief, for appellees.

Before TORRUELLA, Chief Judge, LYNCH and LIPEZ, Circuit Judges.

TORRUELLA, Chief Judge.

Plaintiff The Serpa Corporation brings this suit against defendant corporations McWane, Inc., Anaco, and Tyler Pipe Industries, alleging violations of the federal antitrust laws and various state law causes of action. The district court dismissed plaintiff's antitrust claims on June 10, 1998, and granted summary judgment for defendants on the remaining state law claims on January 12, 1999. This appeal followed. After carefully examining the record and the law, we affirm.

## BACKGROUND

The Serpa Corporation is a distributor of plumbing supplies. Between 1976 and 1996, Serpa was the exclusive sales representative in New England for certain plumbing supply products manufactured by defendant Anaco.

Anaco manufactures cast iron soil pipes ("CISPs") and stainless steel no-hub joints known as fittings and couplings. CISPs, fittings, and couplings are used to transport human waste from buildings to sewer lines. Because the products are manufactured in accordance with industry standards, they are virtually identical across

companies. Historically, the products were sold through exclusive sales representatives, like Serpa, who sold the products to plumbing supply wholesalers on the basis of price. In this case, Serpa sold couplings and fittings manufactured by Anaco and used its position as a regional sales representative to offer price discounts to wholesalers within guidelines set by Anaco.

Serpa's complaint alleges that between November 1995 and August 1996, defendant McWane acquired both Tyler and Anaco. Prior to being acquired by McWane, Tyler was a competitor of Anaco's. Plaintiff further alleges that the acquisitions of Tyler and Anaco gave McWane control of more than eighty-five percent (85%) of the couplings and fittings market in New England.

After acquiring Anaco, McWane placed the marketing of Anaco products under the direction of Tyler and subsequently terminated Serpa as a sales representative for Anaco products. The November 19, 1996 termination letter stated that Anaco would pay Serpa a duplicate commission for all orders received and invoiced for one month, rather than have Serpa serve as a "lame duck" sales representative for that time.

Serpa filed this suit on July 7, 1997, alleging that defendants' consolidation lessened competition and constituted an attempt to monopolize the New England market for CISPs, fittings, and couplings in violation of the federal antitrust statutes. Serpa also alleged state law causes of action for breach of contract, interference with advantageous business relations, breach of the implied covenant of good faith and fair dealing, and violation of the Massachusetts Consumer Protection Act, M.G.L.A. c. 93A.

The district court dismissed plaintiff's antitrust claims on June 10, 1998, and granted summary judgment for defendants on the remaining state law claims on January 12, 1999.

## DISCUSSION

### I. *Plaintiff's Antitrust Claims*

Plaintiff argues that the district court erred in dismissing its antitrust claims for lack of standing. We review a dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) *de novo*, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of the party dismissed. *See Carreiro v. Rhodes Gill and Co., Ltd.*, 68 F.3d 1443, 1446 (1st Cir.1995); *Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir.1993). We do not, however, accept a plaintiff's unsupported conclusions or interpretations of law. *Id.* For the reasons stated below, we affirm the ruling of the district court.

Plaintiff's complaint alleges that McWane's acquisition of Anaco and Tyler has had and will have the effect of substantially lessening competition or tending to create a monopoly in the New England market for CISPs, fittings, and couplings in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and § 7 of the Clayton Act, 15 U.S.C. § 18. Before reaching the merits of the federal antitrust claim, defendants moved the district court to dismiss on the grounds that the plaintiff lacks standing under § 4 of the Clayton Act.

Section 4 of the Clayton Act provides a private cause of action for violations of the federal antitrust laws. The statute states:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15. Despite the broad language of § 4, the Supreme Court has held that § 4 of the Clayton Act does not "allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Blue Shield*

*of Va. v. McCready,* 457 U.S. 465, 477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *see also Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."). Instead, the Court has created a comprehensive antitrust standing doctrine to determine which persons are entitled to bring suit under the federal antitrust statutes. *See Associated General Contractors of Cal., Inc., v. California State Council of Carpenters,* 459 U.S. 519, 529–35, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Sullivan v. Tagliabue,* 25 F.3d 43, 45 (1st Cir.1994).

■ Standing is restricted in antitrust cases to avoid overdeterrence. By limiting the availability of private antitrust actions to certain parties, federal courts "ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability." *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1449 (11th Cir.1991); *see also Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir.1993) ("Given the potential scope of antitrust violations and the availability of treble damages, an overbroad reading of § 4 could result in 'overdeterrence,' imposing ruinous costs on antitrust defendants, severely burdening the judicial system, and possibly chilling economically efficient behavior."). The result is that standing in an antitrust case is "not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Todorov,* 921 F.2d at 1448 (citing *Associated General,* 459 U.S. at 535, 103 S.Ct. 897).

■ In *Associated General,* the Supreme Court set forth six factors that must be evaluated on a case-by-case basis to determine whether a plaintiff has standing to bring an antitrust action. *See Sulli-van,* 25 F.3d at 46 (citing *Associated General,* 459 U.S. at 537–45, 103 S.Ct. 897). These factors are: (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages. *See id.*

Although courts must "consider the balance of factors in each case in an effort to guard against 'engraft[ing] artificial limitations on the § 4 remedy,'" *Sullivan,* 25 F.3d at 46 (quoting *McCready,* 457 U.S. at 472, 102 S.Ct. 2540), we can dispose of this case on the antitrust injury factor since distributors, like Serpa, presumptively lack antitrust standing. *Cf. SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.,* 48 F.3d 39, 44–45 (1st Cir.1995).

■ The Supreme Court has defined "antitrust injury" as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The harm "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)). Consequently, a proper plaintiff "must prove more than injury causally linked to an illegal presence in the market." *Id.*

■ Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury. *See*

*SAS*, 48 F.3d at 44–45. ("[T]he presumptively 'proper' plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market."). In contrast, a commercial intermediary, such as a distributor or sales representative, generally lacks standing because its antitrust injury is too remote. *See, e.g., G.K.A. Beverage Corp.*, 55 F.3d at 767; *SAS*, 48 F.3d at 44; *Fischer v. NWA, Inc.*, 883 F.2d 594, 600 (8th Cir.1989); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 500 (9th Cir.1977); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 33 (5th Cir.1977). A leading antitrust treatise explains:

> [C]learly lacking antitrust injury, and thus having no standing, is the firm whose injury is caused merely by the efficiency effects of a vertical merger. For example, once a firm has integrated vertically into distribution by acquiring one or more existing distributors, it may reduce costs by dealing only with its wholly-owned distributors. A distributor terminated for this reason might certainly suffer injury-in-fact, but it would not suffer antitrust injury as long as there were alternative sources of the product.

Areeda & Hovenkamp, *Antitrust Law* ¶ 381'c, at 114 (Supp.1999).

*Fischer* is indicative of the case law concerning antitrust injury. In *Fischer*, former stockholders of a regional airline, Fischer Bros. Aviation, filed an antitrust suit against Northwest Airlines. The complaint stated that on December 23, 1995 Northwest and Fischer signed an exclusive regional airline service agreement for all flights originating in Detroit. On January 23, 1986, one month after the Northwest/Fischer agreement was signed, Northwest announced that it was acquiring Republic Airlines. At that time, Republic had an ongoing, exclusive service contract for the Detroit market with Simmons Airlines. Unlike the Northwest/Fischer agreement, however, the Republic/Simmons agreement had no subsidization arrangement and was not terminable at will with six months notice.

On August 12, 1986, the Department of Transportation approved Northwest's acquisition of Republic. Although the acquisition created a conflict between the Fischer and Simmons regional service agreements, Northwest believed that a compromise could be reached, accommodating the contractual rights of both regional carriers and permitting them to share the Detroit market. However, all attempts to resolve the Fischer/Simmons conflict failed, and Northwest was forced to terminate the Fischer contract.

Fischer subsequently filed suit in federal court, asserting antitrust claims against both Northwest and Simmons. Defendants moved for summary judgment, and the district court granted the motion. The Eighth Circuit concluded that Fischer had not suffered antitrust injury and therefore lacked antitrust standing. The court reasoned:

> Our review of the record convinces us that Fischer failed to prove that it has suffered an antitrust injury. Fischer does not contend that it was a customer of Northwest forced to pay increased prices. Nor was Fischer a competitor injured by Northwest's acquisition of monopoly power (roughly 75% of the Detroit market). Rather, Fischer asserts that it suffered damage when it was terminated as Northwest's exclusive regional carrier in Detroit. We conclude that Fischer's termination was not caused by anticompetitive conduct or an anticompetitive effect of such conduct; rather, it was caused by Northwest's need to avoid employing two regional airlines where only one was required. We are convinced that even in a city in which Northwest had far less than monopoly power, it would have been reluctant to waste resources on overlapping contractual agreements providing twice

the regional connecting flight service required.

*Fischer*, 883 F.2d at 600.

*Olympia Brewing Co.* is also illustrative. The defendant, Olympia, acquired Hamm's Brewing Co. and terminated Hamm's distributors, including the plaintiff, John Lenore & Co. Lenore sued Olympia, alleging that the acquisition violated § 7 of the Clayton Act because it substantially lessened competition. The district court granted summary judgment in favor of Olympia, and the Ninth Circuit affirmed.

Citing *Brunswick,* the Ninth Circuit held that Lenore did not have standing to sue because it had not suffered antitrust injury. *See Olympia Brewing Co.*, 550 F.2d at 500. The court reasoned that the acquisition of Hamm's violated the antitrust laws, if at all, because competition was reduced in the manufacture of beer, a market in which Lenore was neither a competitor nor a consumer.

> Even though Lenore's injury may have ". . . occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisition unlawful." The terminations were an incidental matter which the merger may have made possible, but certainly did not cause. All Lenore really alleges is that because Olympia purchased the Hamm's brand, Lenore was replaced in favor of other distributors. This is insufficient to make out a case under § 7 which is concerned with competition, not competitors.

*Id.* (internal citations omitted).

 Here, Serpa does not bring its claim as either a competitor or a consumer but as a distributor whose injuries resulted from the loss of its position as Anaco's exclusive sales representative in the New England market. This loss is neither connected with, nor resulted from, defendant's market power in the CISPs, fittings, and couplings industry. Therefore, plaintiff's injuries do not flow "from that which makes the defendants' acts unlawful."

*Brunswick,* 429 U.S. at 489, 97 S.Ct. 690. Because Serpa's injuries flow from the termination of its distributorship, and not from any anticompetitive effects of defendants' acquisition of Anaco, we find that Serpa has not suffered an antitrust injury. *See G.K.A. Beverage Corp.*, 55 F.3d at 767; *SAS,* 48 F.3d at 44; *Fischer,* 883 F.2d at 600; *Olympia Brewing Co.*, 550 F.2d at 500.

In reaching this conclusion, we recognize that there may be some instances where presumptively disfavored plaintiffs do have standing to bring an antitrust action. *See SAS,* 48 F.3d at 45. In *SAS,* this court stated that although competitors and consumers are presumptively favored, " 'presumptively' does not mean always; there can be exceptions, for good cause shown." *Id.* Here, Serpa alleges that it is the "only truly viable plaintiff" because (1) "there is no real competitor on the manufacturing level," and (2) plumbing wholesalers, contractors, and home buyers have no incentive to file an antitrust suit because monopoly pricing in this market increases the costs to individual consumers by a relatively small margin. This Court has stated that the "most obvious reason for conferring standing on a second-best plaintiff is that, in some general category of cases, there may be no first best with the incentive to sue." *Id.* (citing *Associated General,* 459 U.S. at 542, 103 S.Ct. 897). In this case, however, we are satisfied that at least some consumers, as well as defendants' competitors, have ample incentive to bring an antitrust claim.

> The complaint alleges:
> Shortly after the termination of Serpa as the representative for Anaco Couplings and Fittings, Anaco began to increase its prices for Couplings by announcing a wholesale list price increase of approximately seven percent (7%) and reducing the amount of discounts commonly provided to wholesalers.

A seven-plus percent increase in the cost of major plumbing components is not de minimus. Although the individual home

buyer may be hindered by imperfect information, there is ample reason to believe that large contractors and commercial entities involved in the construction of "multi-unit residential and commercial buildings" have the necessary information, incentive, and resources to resist monopoly pricing by defendants.

As for defendants' competitors, the complaint indicates that they account for approximately fifteen percent (15%) of the New England market. We need look no further to rebut plaintiff's assertion that "there is no real competitor on the manufacturing level." The complaint, however, contains two additional allegations that we believe are significant. First, the complaint states that in 1992 Anaco instituted an antitrust action in federal court against Tyler for engaging in predatory pricing. Second, the complaint alleges that defendants have acted in concert to "eliminate competition in the sale of Couplings and Fittings in the New England market." Although competitors are not necessarily injured by monopoly pricing, they are clearly injured by an abuse of monopoly power such as predatory pricing. Where, as here, the complaint alleges that defendants have an intent to eliminate competition in the New England market and have been sued for engaging in anticompetitive conduct in the recent past, there is every reason to believe that defendants' competitors have ample incentive to bring an antitrust claim. Accordingly, there is no reason to extend antitrust standing to Serpa, a distributor incidentally connected to the alleged antitrust violation in this case.

Finally, plaintiff's reliance on *Blue Shield of Va. v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), is misplaced. In *McCready*, the court held that a consumer of health services could sue under the antitrust laws to redress an alleged conspiracy between her insurance plan and Virginia psychiatrists. The terms of the plan precluded participants from receiving reimbursements for treatment given by psychologists. Although McCready was not the immediate target of the alleged boycott, she was a plan beneficiary who had used a psychologist and had been denied reimbursement. The Supreme Court granted McCready standing, stating that her injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484, 102 S.Ct. 2540. The Court further stated that McCready was the "necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* at 479, 102 S.Ct. 2540.

Serpa urges the Court to apply the "inextricably intertwined" language of *McCready* to this case. We decline. First, this Court has already stated that "[i]t is doubtful that this language—if taken as a physical image—was ever intended as a legal test of standing." *SAS*, 48 F.3d at 46. Second, while standing in *McCready* was conferred to a plaintiff who was only derivatively injured, the plaintiff was a consumer in the market directly affected by the antitrust violation. Accordingly, subsequent Supreme Court jurisprudence has interpreted the *McCready* language as a legal conclusion; i.e., applying the "inextricably intertwined" standard to consumers and competitors. *See Atlantic Richfield v. USA Petroleum Co.*, 495 U.S. 328, 345, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Associated General*, 459 U.S. at 539, 103 S.Ct. 897; *SAS*, 48 F.3d at 46. Moreover, even if we thought "inextricably intertwined" was a proper test for standing, the facts do not support its application in this case. Specifically, Serpa's marginal pricing discretion belies plaintiff's assertion that defendants necessarily had to terminate Serpa to eliminate competition in the New England plumbing supply market. Therefore, under the circumstances of this case, we decline to interpret *McCready* broadly, believing that such an approach would needlessly expand the limits of antitrust standing currently in place in this Circuit.

## II. Plaintiff's State Law Causes of Action

Following the district court's dismissal of the antitrust claims, the parties commenced discovery on plaintiff's remaining state law claims. The complaint alleged (1) breach of contract; (2) interference with advantageous business relations; (3) breach of the implied covenant of good faith and fair dealing; and (4) violation of the Massachusetts Consumer Protection Act, M.G.L.A. c. 93A. At the conclusion of the scheduled discovery period, defendants moved for summary judgment on these remaining counts, and the district court granted the motion on January 12, 1999.

### A. Breach of Contract

Anaco informed Serpa of its intent to terminate Serpa as its exclusive sales representative by letter dated November 19, 1996. The letter indicated that Serpa's termination was effective immediately, but stated that Anaco would pay Serpa a duplicate commission for all orders received and invoiced for one month, rather than have Serpa serve as a "lame duck" sales representative for that time.

█ Under Massachusetts law, a contract without a durational term is terminable at will by either party upon reasonable notice. *See Teitelbaum v. Hallmark Cards Inc.*, 25 Mass.App.Ct. 555, 520 N.E.2d 1333, 1336 (1988). Plaintiff argues that whether Anaco provided reasonable notice of termination is a question of fact, and therefore summary judgment was inappropriate. We disagree.

█ In *Teitelbaum*, the court determined that a breach of contract claim for inadequate notice of termination may be disposed of by motion for summary judgment. *See id.* at 1336. In reaching this conclusion, the court stated that reasonableness of notice "is measured in terms of the ability of the party affected by the termination to obtain a substitute arrangement." *Id.*

If that party is able to obtain another supplier before the performance of the party effecting termination becomes due, then it necessarily follows that the terminating party has furnished reasonable notice and will not be responsible for damages. Put another way, the adequacy of the notice is generally coextensive with the amount of harm that can be proved by the party who has incurred the loss of a supplier.

*Id.* Here, there is no evidence in the record that Serpa's injuries resulted from inadequate notice of termination. Serpa merely states that following its termination by Anaco it was deprived of its commissions on Anaco products. This is an inevitable loss and does not arise from the manner in which the contract was terminated.

Plaintiff's reliance on *Cherick Distributors, Inc. v. Polar Corporation*, 41 Mass. App.Ct. 125, 669 N.E.2d 218 (1996), is misplaced. In *Cherick*, the plaintiff's exclusive distributorship agreement was terminated by defendant on four days notice in retaliation for a letter plaintiff sent to other distributors urging the distributors to collectively negotiate with the defendant. The court determined that "[w]hether the four-day termination notice constituted reasonable notice under commercial standards of good faith and fair dealing was a question properly put to the jury in this case." *Id.* at 220. The court reasoned:

The evidence indicated that the four-day notice left Cherick with no time to secure another supplier, make adjustments in its equipment and warehouse, and maintain its staff. Accordingly, there was adequate support for the jury's finding that four days' notice was unreasonable and that it constituted a breach of the covenant of good faith and fair dealing.

*Id.* Here, in contrast, plaintiff did not present any evidence that a month was insufficient time to secure another supplier, to make adjustments to its operations, or that it provided Serpa with an inadequate opportunity to maintain its staff. According-

ly, *Cherick* does not require reversal of the district court's ruling.

## B. Implied Covenant of Good Faith and Fair Dealing

■ Plaintiff argues that its abrupt termination constitutes a breach of the implied covenant of good faith and fair dealing that is implicit in every contract. *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 820 (1991) ("Every contract implies good faith and fair dealing between the parties to it."). Plaintiff's argument is unavailing. The notice of termination was reasonable and there is nothing per se unreasonable about terminating an exclusive distributorship contract.

Plaintiff's reliance on *Cherick* is once again misplaced. The *Cherick* plaintiff was terminated by defendant on four days notice, in retaliation for its suggestion to similarly situated distributors that they band together and collectively bargain with the defendant manufacturer. In this case, there is no evidence that Anaco's termination of Serpa had a retaliatory motive, was undertaken in bad faith, or otherwise violated public policy. Additionally, Serpa was paid commissions for a period of thirty days following its termination. Under these circumstances, we find that Serpa cannot show a breach of the implied covenant of good faith and fair dealing.

## C. Intentional Interference With Advantageous Business Relationship

■ Under Massachusetts law, to state a cause of action for intentional interference with an advantageous business relationship, plaintiff "must plead and prove that the defendants (1) engaged in intentional and willful acts (2) calculated to cause damage to the plaintiffs' lawful business (3) with an unlawful purpose and without right or justification, (4) thereby causing actual damage or loss." *Doyle v. Hasbro, Inc.*, 884 F.Supp. 35, 40 (D.Mass. 1995); *Chemawa Country Golf, Inc. v.*

*Wnuk,* 9 Mass.App.Ct. 506, 402 N.E.2d 1069, 1072 (1980).

■ In this case, Serpa argues that "defendants acted in stealthy haste to terminate Serpa's contract to prevent it from acquiring competing product lines to sell to its former Anaco customers." As with its other contractual claims, Serpa relies on *Cherick* in support of its argument. Again, however, we find that *Cherick* is inapposite. In *Cherick,* the court held "[t]he jury could have found that the abrupt termination of Cherick's distributorship agreement, coinciding as it did with the planned meeting of Polar distributors, was calculated to put Cherick out of business and thereby discourage other distributors from meeting." 669 N.E.2d at 220. Here, in contrast, defendants made a legitimate business decision based on obvious efficiency concerns to eliminate one of two overlapping distributors. There is no evidence in the record of an unlawful or improper motive, and nothing in the record indicates that defendants' conduct was calculated to injure Serpa. Further, there is no evidence that a month is insufficient notice of termination. Accordingly, we find that summary judgment on this claim was proper.

## D. Massachusetts General Laws ("Chapter 93A")

■ For conduct to violate Chapter 93(A) it must (1) fall within "the penumbra of some common-law, statutory, or other established concept of unfairness"; (2) be "immoral, unethical, oppressive, or unscrupulous"; and (3) "cause[ ] substantial injury to [other businessman]." *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 679 N.E.2d 191, 209 (1997) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)). Here, Serpa relies on the "same facts underlying its federal antitrust claims to ·support its Massachusetts statutory claim."

Having carefully reviewed the record, we conclude there is no evidence of "immoral, unethical, oppressive, or unscrupulous" conduct sufficient to state a Chapter 93A claim. *See Bradley v. Dean Witter Realty, Inc.*, 967 F.Supp. 19, 29 (D.Mass.1997). As a matter of law, "a refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice under G.L.C. 93A, and is therefore not actionable." *PMP Assocs.*, 321 N.E.2d at 919. Accordingly, summary judgment on this claim was proper.

## CONCLUSION

For the reasons stated above, we **affirm** the judgment of the district court.