

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-22-2000

# Pace Electr. Inc. v. Canon Comp. Systems

Precedential or Non-Precedential:

Docket 99-5728

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Pace Electr. Inc. v. Canon Comp. Systems" (2000). *2000 Decisions.* Paper 106.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/106

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 22, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5728

PACE ELECTRONICS, INC.

Appellant

v.

CANON COMPUTER SYSTEMS, INC. and
LAGUNA CORPORATION

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 98-cv-03132)
District Judge: Honorable John C. Lifland

Argued: March 14, 2000

Before: MCKEE, RENDELL and ROSENN,
Circuit Judges.

(Filed: May 22, 2000)

        Elliott Joffe (Argued)
        Steven Robert Lehr, P.C.
        33 Clinton Road
        Suite 100
        West Caldwell, NJ 07006
         Counsel for Appellant Pace
         Electronics, Inc.

Richard H. Silberberg (Argued)
Robert G. Manson
Dorsey & Whitney LLP
250 Park Avenue
New York, New York 10177
 Counsel for Appellee Canon
 Computer Systems, Inc.

Carl A. Rizzo
Cole, Schotz, Meisel, Forman &
 Leonard
25 Main Street
Hackensack, NJ 07601
 Counsel for Appellee Laguna
 Corporation

OPINION OF THE COURT

ROSENN, Circuit Judge.

The issue in this appeal is whether the termination of a wholesale dealer's contract for its refusal to acquiesce in an alleged vertical minimum price fixing conspiracy constitutes an antitrust injury that will support an action for damages under section 4 of the Clayton Act. The United States District Court for the District of New Jersey reasoned that a dealer terminated under these circumstances does not suffer an antitrust injury unless it can demonstrate that its termination had an actual, adverse economic effect on a relevant market. After concluding that the plaintiff's complaint in the instant case failed to allege such an effect, the District Court dismissed the complaint for failure to state a claim upon which relief may be granted. Because we believe the court misconstrued the antitrust injury requirement, we will reverse.[1]

_____

1. The District Court exercised jurisdiction under 28 U.S.C. S 1331. We have appellate jurisdiction under 28 U.S.C. S 1291 and undertake plenary review of the District Court's order dismissing the plaintiff's complaint.

2

I.

The plaintiff, Pace Electronics, Inc. ("Pace"), a New Jersey corporation, is engaged in the business of distributing various electronic products, including computer printers and related accessories. Pace purchases these products from manufacturers and wholesale distributors and then resells them to smaller retailers, who operate in the New Jersey and New York region.

In April of 1996, Pace entered into a nonexclusive dealer agreement with defendant Canon Computer Systems, Inc. ("Canon"), a California corporation. Under this agreement, Pace obtained the right to purchase Canon-brand ink-jet printers and related accessories from Canon at "dealer prices." In consideration for the right to purchase these products at "dealer prices," Pace agreed to purchase certain minimum quantities of the products.

The dealer agreement between Pace and Canon remained in effect for approximately one year and three months. Thereafter, on July 1, 1997, Canon terminated the agreement with Pace on the stated ground that Pace failed to purchase the minimum quantities of Canon-brand products required of it under the dealer agreement. Although Pace concedes that it did not purchase the amount of Canon-brand products called for under the dealer agreement, Pace contends that it was unable to do so because Canon ignored its purchase orders. Pace further contends that Canon ignored its purchase orders because Pace refused to acquiesce in a vertical minimum price fixing agreement designed and implemented by Canon and defendant Laguna Corporation ("Laguna"), Pace's direct competitor in the New Jersey and New York region.

In this connection, Pace alleges that, prior to the time it entered its dealer agreement with Canon, Laguna had entered into a similar dealer agreement with Canon. Additionally, Pace alleges that the agreement between Canon and Laguna contemplated the maintenance of a minimum resale price below which Laguna would not sell Canon-brand ink-jet printers. In support of its allegation, Pace asserts that after it entered into its dealer agreement with Canon, the president of Canon repeatedly instructed

3

Pace's president not to sell to past or existing customers of Laguna and not to sell Canon brand ink-jet printers at prices less than those at which Laguna was selling its products.

Pace alleges that it has suffered financial losses as a result of its termination as an authorized Canon-brand dealer. Specifically, Pace avers that "[a]s a direct and proximate result of the actions of Defendants . . . Pace has suffered significant financial detriment, consisting of, but not necessarily limited to, lost profits. Pace's losses result directly and proximately from the efforts of Canon and Laguna to limit price competition in the market . . . for which both Laguna and Pace were competing." Appellant's App. at 77. Although these allegations of loss appear somewhat vague and conclusory, we accept them as true, as we must, for the purposes of this appeal.

Pace also alleges that its termination as an authorized dealer of Canon-brand products has harmed competition in two respects. First, it contends that its termination as a dealer has reduced price competition in the wholesale market for Canon-brand ink-jet printers (an intrabrand market) because Laguna no longer faces price competition from Pace in selling these products to smaller retailers. Second, Pace asserts that its termination as a dealer has reduced price competition in the wholesale market for all brands of ink-jet printers (an interbrand market). In this connection, Pace alleges that: (1) Canon-brand ink-jet printers enjoy an inherent competitive price advantage over the ink-jet printers of other manufacturers; (2) until Canon permits its distributors to take advantage of this price advantage, other manufacturers will not attempt to reduce their production costs; and, (3) until an unrestrained free competitive market requires other manufacturers to reduce their production costs, the price of all brands of ink-jet printers will remain at an artificially high level.

II.

To state a claim for damages under section 4 of the Clayton Act, 15 U.S.C. S 15, a plaintiff must allege more than that it has suffered an injury causally linked to a

4

violation of the antitrust laws. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). In addition, it must allege antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Id. This is so even where, as in the instant case, the alleged acts of the defendants constitute a per se violation of the antitrust laws.2See also Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341 (1990). In applying the antitrust injury requirement, the Supreme Court has inquired whether the injury alleged by the plaintiff "resembles any of the potential dangers" which led the Court to label the defendants' alleged conduct violative of the antitrust laws in the first instance. Id. at 336; see also II AREEDA & HOVENKAMP, ANTITRUST LAW, AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION P 362a. (Revised ed. 1995) [hereinafter AREEDA & HOVENKAMP] ("The [antitrust injury requirement] forces . . . courts to connect the alleged injury to the purposes of the antitrust laws. Compensation for that injury must be consistent with . . . the rationale for condemning the particular defendant.").

For example, in Atlantic Richfield, the plaintiff, an independent retail marketer of gasoline, brought suit against ARCO, an integrated oil company which sold gasoline to consumers through its own stations and indirectly through ARCO-brand dealers, claiming that ARCO violated section 1 of the Sherman Act by conspiring with its dealers to fix the maximum resale price of gasoline at an artificially low level. Id. at 331. Although the plaintiff conceded that the fixed prices were not predatory, it nevertheless maintained that it suffered antitrust injury, in the form of lost profits, as a result of the vertical maximum price fixing agreement between ARCO and its dealers. See id. at 334-35. The Supreme Court disagreed, noting that the plaintiff's alleged injury did not resemble any of the dangers which caused the Court to label vertical maximum

_____

2. Vertical minimum price fixing is, of course, per se unlawful under section 1 of the Sherman Act, which outlaws "[e]very contract combination . . . or conspiracy in restraint of trade or commerce among the several states." 15 U.S.C. S 1; see also Dr. Miles Med. Co. v. John D. Park. & Sons Co., 220 U.S. 373 (1911).

price fixing per se illegal in Albrecht v. Herald Co., 390 U.S. 145 (1968).3 See id. at 336.

In this connection, the Court identified four potential adverse effects of vertical maximum price fixing agreements which led it to label those agreements per se illegal in the Albrecht decision. First, it noted that a vertical maximum price fixing agreement might intrude on the ability of dealers to compete and survive " `by substituting the perhaps erroneous judgment of a [supplier] for the forces of the competitive market.' " Id. at 335 (quoting Albrecht, 390 U.S. at 152). Additionally, the Court observed that " `[m]aximum prices may be fixed too low for the dealer to furnish services essential to the value which goods have for the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay.' " Id. at 335-36. Next, the Court explained that "[b]y limiting the ability of small dealers to engage in nonprice competition, a maximum-price-fixing agreement might `channel distribution through a few large or specifically advantaged dealers.' " Id. at 336. Finally, the Court noted that " `if the actual price charged under a maximum price scheme is nearly always the fixed maximum price, which is increasingly likely as the maximum price approaches the actual cost of the dealer, the scheme tends to acquire all the attributes of an arrangement fixing minimum prices.' " Id.

Having identified the potential dangers which led it to condemn categorically vertical maximum price fixing agreements, the Supreme Court had little difficulty determining that the plaintiff in Atlantic Richfield had not suffered an antitrust injury. The Court noted that the dangers identified in the Albrecht decision focused on the potential adverse effects of vertical maximum pricefixing

_____

3. Albrecht's specific holding -- that vertical maximum price fixing is per
se illegal -- has since been overruled. See State Oil Co. v. Khan, 522 U.S.
3, 7 (1997). However, Atlantic Richfield's approach -- i.e. discerning the
reasons that led the Supreme Court to label certain conduct a per se
violation, and determining whether the harm suffered by the plaintiff is
consistent with the rationale for labeling the defendant's conduct per se
illegitimate -- remains valid and is clearly applicable to the case before
us.

agreements on dealers and consumers, not competitors of dealers subject to such agreements. See id. The Court explained: "[i]ndeed, the gravamen of [the plaintiff's] complaint--that the price fixing scheme between[the defendant] and its dealers enabled those dealers to increase their sales--amounts to an assertion that the dangers with which we were concerned in Albrecht have not materialized in the instant case." Id. at 337. In sum, the Court concluded that the plaintiff had not suffered antitrust injury because its losses did not flow from those aspects of vertical maximum pricing that rendered it illegal. Id. at 337.

Turning now to the instant case, we think it appropriate to ask whether Pace's alleged injury resembles any of the dangers which have led the Supreme Court to condemn vertical minimum price fixing agreements under the antitrust laws. Pace alleges that it has suffered antitrust injury because it was terminated as a wholesale dealer after it sold Canon-brand products at prices below the minimum resale price allegedly fixed by Canon and Laguna. Pace further alleges that its termination as a wholesale dealer has caused it to suffer lost profits because it may no longer obtain profits from selling Canon-brand products at "dealer prices." Under the Supreme Court's jurisprudence, these allegations suffice to establish antitrust injury.

On this point, Simpson v. Union Oil, 377 U.S. 13 (1964) is instructive. In Simpson, the plaintiff entered into a year-to-year "consignment" agreement with Union Oil. See id. at 14. Under the agreement, which was terminable by either party at the end of any one-year term, Union Oil required the plaintiff to charge a minimum retail price for gasoline. See id. Contrary to the terms of the agreement with Union Oil, the plaintiff sold gasoline below the minimum retail price. See id. at 15. Because he did so, Union Oil terminated its "consignment" agreement with the plaintiff at the end of the first one-year term. See id.

Sometime thereafter, the plaintiff brought suit against Union Oil seeking damages under section 4 of the Clayton Act. See id. After two pretrial hearings, the District Court granted summary judgment in favor of Union Oil, holding that the plaintiff failed to establish a violation of section 1 of the Sherman Act and that, even assuming the plaintiff

7

had established a violation, the plaintiff suffered no actionable damage. See id. at 15-16. The Court of Appeals affirmed on the ground that the plaintiff suffered no actionable wrong or damage. See id. at 16. The Supreme Court granted certiorari and reversed.

In reversing, the Court placed primary focus on the consignment agreement's restriction on the ability of dealers such as the plaintiff to make independent, competitive pricing decisions. For example, the Court explained:

> We disagree with the Court of Appeals that there is no actionable wrong or damage if a Sherman Act violation is assumed. If the "consignment" agreement achieves resale price maintenance in violation of the Sherman Act, it and the lease are being used to injure interstate commerce by depriving independent dealers of the exercise of free judgment whether to become consignees at all, or remain consignees, and, in any event, to sell at competitive prices.

Id. (emphasis added).

The Court also stated:

> Dealers, like [the plaintiff], are independent businessmen; and they have all or most of the indicia of entrepreneurs, except for price fixing. . . . Their return is affected by the rise and fall in the market price, their commissions declining as retail prices drop. Practically the only power they have to be wholly independent businessmen, whose service depends on their own initiative and enterprise, is taken from them by the proviso that they must sell their gasoline at prices fixed by Union Oil. . . . The evil of the resale price maintenance program . . . is its inexorable potentiality for and even certainty in destroying competition in retail sales of gasoline by these nominal `consignees' who are in reality small struggling competitors seeking retail gas customers.

Id. at 21 (emphasis added) (footnote and citations omitted).

Thus, the Supreme Court considered a restriction on dealer independence with respect to pricing decisions to be

8

an anticompetitive aspect of vertical minimum pricefixing agreements, and one that the antitrust laws have an interest in forestalling. See Richard A. Posner, Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions, 75 Colum. L. Rev. 281, 289-90 [hereinafter Antitrust Policy] ("According to the Court in Simpson, resale price maintenance is bad because it benefits the manufacturer and oppresses the dealer by taking from the latter the power to price competitively."). Accordingly, we think that a maverick dealer, such as Pace, which is terminated for charging prices less than those set under a vertical minimum price fixing agreement, suffers the type of injury which the antitrust laws are designed to prevent and may recover damages, such as lost profits, whichflow from that termination. See generally AREEDA & HOVENKAMP, supra, PP 382a. and 382c. (discussing dealer standing to challenge various vertical restraints and noting that a terminated dealer which "can reasonably show that he would have been able to profit in a market free of the illegal arrangements has presumably suffered both injury-in-fact and antitrust injury."); see also Simpson, 377 U.S. at 16 ("There is an actionable wrong whenever the restraint of trade has an impact on the market; and it matters not that the complainant may be only one merchant.").

Naturally, the defendants argue that the above analysis misses the mark. In essence, they contend that Simpson is no longer good law in light of the Supreme Court's decision in Atlantic Richfield. Furthermore, they urge, and the district court agreed, that a terminated dealer seeking to establish that it has suffered antitrust injury must allege facts demonstrating that its termination as an authorized dealer resulted in an actual, adverse economic effect on competition in a relevant interbrand market. In support of their position, the defendants primarily rely on the Supreme Court's statement in Atlantic Richfield that a plaintiff can recover damages under section 4 of the Clayton Act "only if [its] loss[es] stem[ ] from a competition-reducing aspect or effect of the defendant's behavior." Atlantic Richfield, 495 U.S. at 344. On the basis of this brief statement, the defendants then argue that to be "competition-reducing" a defendant's challenged conduct

9

must have had an actual adverse effect on a relevant interbrand market. Although the defendants' syllogism may have some allure, we decline to construe the antitrust injury requirement as suggested by the defendants for the following reasons.

First, we believe that requiring a plaintiff to demonstrate that an injury stemming from a per se violation of the antitrust laws caused an actual, adverse effect on a relevant market in order to satisfy the antitrust injury requirement comes dangerously close to transforming a per se violation into a case to be judged under the rule of reason. The per se standard is reserved for certain categories of conduct which experience has shown to be "manifestly anticompetitive." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 39 (1977). That standard, which is based on considerations of "business certainty and litigation efficiency," Arizona v. Maricopa County Med. Society, 457 U.S. 332, 344 (1982), allows a court to presume that certain limited classes of conduct have an anticompetitive effect without engaging in the type of involved, market-specific analysis ordinarily necessary to reach such a conclusion. See Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723 (1988) ("Certain categories of agreements, however, have been held to be per se illegal, dispensing with the need for case-by-case evaluation."). Were we to accept the defendants' construction of the antitrust injury requirement, we would, in substance, be removing the presumption of anticompetitive effect implicit in the per se  standard under the guise of the antitrust injury requirement.4

Second, we do not believe that the Supreme Court's statement in Altlantic Richfield that a plaintiff can recover for losses only if they stem "from a competition-reducing aspect or effect of the defendant's behavior," Atlantic

_____

4. We recognize that various scholars have taken issue with the Supreme Court's per se treatment of vertical minimum price fixing agreements and argued that these agreements may have significant, procompetitive attributes. See, e.g., Antitrust Policy, 75 Colum. L. Rev. at 283. But, academic commentary, even if persuasive, does not permit us to expand the antitrust injury requirement to a point which undermines the Court's categorical disapproval of vertical minimum price fixing.

10

Richfield, 495 U.S. at 344, when viewed in the context of the Court's entire opinion, can be fairly read to require a terminated dealer to prove that its termination caused an actual, adverse economic effect on a relevant market. In this connection, we note that in determining that the plaintiff in Atlantic Richfield failed to satisfy the antitrust injury requirement, the Supreme Court simply did not focus on whether the challenged conduct of the defendant had an actual, adverse economic effect on a relevant market. Rather, as outlined above, the Court focused on whether the plaintiff's injury stemmed from any of the potential anticompetitive dangers which led the Court to label vertical maximum price fixing unlawful in the first instance. Implicit in the Court's approach is that a plaintiff who had suffered loss as a result of an anticompetitive aspect of a per se restraint of trade agreement would have suffered antitrust injury, without demonstrating that the challenged practice had an actual, adverse economic effect on a relevant market. See generally Daniel C. Richman, Note, Antitrust Standing, Antitrust Injury, and the Per Se Standard, 93 Yale. L.J. 1309, 1312-14 (arguing that courts should recognize that "each per se rule presumes a particular practice harms particular markets" and that courts should permit "only plaintiffs within those markets to pursue per se claims"). The issue, thus, is not whether the plaintiff's alleged injury produced an anticompetitive result, but, rather, whether the injury claimed resulted from the anticompetitive aspect of the challenged conduct.

Finally, we point out that our holding -- that a dealer terminated for its refusal to abide by a vertical minimum price fixing agreement suffers antitrust injury and may recover losses flowing from that termination -- is consistent with the decisions of those courts which have explored the issue thus far. See, e.g., Sterling Interiors Group, Inc. v. Haworth, Inc., No. 94-9216, 1996 WL 426379 at *18-*19 (S.D.N.Y. July 30, 1996) ("The anti-competitive dangers of minimum price arrangements flow to both customers who purchase at prices set higher than competitive levels, and to dealers who are effectively foreclosed from competing in the marketplace.").

11

III.

For the reasons set forth above, the district court's order dismissing Pace's complaint will be reversed and the case remanded to the district court for further proceedings consistent with this opinion. Costs taxed against the appellees.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit