**PRECISION SURGICAL, INC., et al.,**

v.

**TYCO INTERNATIONAL, LTD., et al.**

**No. CIV. A. 00–990.**

United States District Court, E.D. Pennsylvania.

Aug. 15, 2000.

---

Mitchell A. Kramer, Mitchell A. Kramer & Associates, Rydal, PA, for Plaintiffs.

Eleanor Morris Illoway, John G. Harkins, Jr., Gay Barlow Parks Rainville, Harkins Cunningham, Philadelphia, PA, for Defendants.

## MEMORANDUM

LUDWIG, District Judge.

Defendants Tyco International, Ltd. and United States Surgical Corporation move to dismiss the amended complaint for lack of standing. Fed.R.Civ.P. 12(b)(6).[1] Jurisdiction is federal question. 28 U.S.C. § 1331.

Plaintiffs Precision Surgical, Inc., Northeast Medical Marketing, LLC, Flanagan Instruments, Inc., and DMA Med–Chem Corporation are distributors of surgical products, including balloon dissectors and ancillary items employed in performing preperitoneal laparoscopic hernia repair surgery. Amended complt. at ¶ 19. In July 1999, defendant U.S. Surgical[2] acquired Origin Medsystems, Inc., a manufacturer of the products used in that type of hernia repair surgery. In November 1999, defendant U.S. Surgical purchased General Surgical Innovations, the only other domestic manufacturer of such products. *Id.* at ¶ 16.

Prior to these two acquisitions, plaintiffs had entered into exclusive distribution contracts with Origin Medsystems, Inc. *Id.* at ¶ 20. In December 1999, U.S. Surgical, as Origin's assignee, established its own direct sales force and terminated the distribution contracts with plaintiffs.[3] *Id.* at ¶ 23. The amended complaint charges defendants with attempting to monopolize and monopolizing the distribution market for its hernia repair surgery products in violation of the Sherman Act, 15 U.S.C. § 2. The monopolistic practice alleged is the termination the distribution contracts with plaintiffs, the effect of which the amended complaint characterizes as follows:

> The anticompetitive objective and effect of [defendants'] decision to terminate the independent distributors of Origin products in order to deal directly with the ultimate purchasers of balloon dissectors and tackers for preperitoneal laparoscopic hernia repair surgery is to eliminate the distributors who have developed a relationship with the ultimate purchasers, in order to control all aspects of the distribution, sale and pricing of such products to the ultimate purchaser to the same extent that defendants ... now entirely control the man-

---

1. Under Fed.R.Civ.P. 12(b)(6), the complaint's allegations are accepted as true, all reasonable inferences are drawn in the light most favorable to the plaintiffs, and dismissal is appropriate only if it appears that plaintiffs could prove no set of facts that would entitle them to relief. *See Port Authority of New York and New Jersey v. Arcadian Corp.*, 189 F.3d 305, 311 (3d Cir.1999).

2. Defendant Tyco International, Ltd. is the parent of defendant U.S. Surgical. Amended complt. at ¶ 11.

3. A breach of contract action involving the same parties and subject matter is pending in California state court. *See* defs.' mem. at ex. B.

ufacture and sale of such products in the United States.

*Id.* at ¶ 36.

■ The concept of antitrust standing in civil cases was formulated in *Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).[4] There, the Court explained that a private antitrust plaintiff claiming damages under 15 U.S.C. § 4 must have sustained an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *See also Pace Electronics, Inc. v. Canon Computer Systems, Inc.,* 213 F.3d 118, 120 (3d Cir. 2000)("The Supreme Court has inquired whether the injury alleged by the plaintiff 'resembles any of the potential dangers' which led the Court to label the defendants' alleged conduct violative of the antitrust laws in the first instance.")(quoting *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 336, 110 S.Ct. 1884, 1890, 109 L.Ed.2d 333 (1990)).[5]

■ At issue here is whether plaintiffs as terminated distributors have *Brunswick* standing to challenge defendants' takeover of the distribution of their own product.[6]

**4.** The term "antitrust standing" is distinct from constitutional standing. *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.*

**5.** Antitrust injury was elaborated upon in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 537, 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983). Several additional factors will be considered in assessing whether to "favor judicial recognition of" a private antitrust claim: injury to business or property, causal connection between an antitrust violation and the harm alleged, directness of the injury, "existence of an identifiable class of persons whole self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," and the potential for duplicative recovery or complex apportionment of damages. *See In re Warfarin Sodium Antitrust Litigation,* 214 F.3d 395, 399 (3d Cir.2000); *see also* 2 Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law ¶ 360 at 191–208 (rev. ed.1995). Also: "Standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss." *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De Nemours and Co.,* 826 F.2d 1235, 1240 (3d Cir.1987). "The treble-damages remedy, if afforded to 'every person tangentially affected by an antitrust violation,' *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476–77, 102 S.Ct. 2540, 2546–

47, 73 L.Ed.2d 149 (1982), or for 'all injuries that might conceivably be traced to an antitrust violation,' *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972), 'would open the door to duplicative recoveries,' *id.* at 264, 92 S.Ct. at 892, and to multiple law suits." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 112 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427(1986). Here, however, because plaintiff lacks antitrust injury, further inquiry is unnecessary. *See City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 265 (3d Cir. 1998)("[T]he district court should first address whether the plaintiff has suffered an antitrust injury.")(decided under Fed.R.Civ.P. 12(b)(6)).

**6.** Defendants rely on two cases to support their position—*The Serpa Corp. v. McWane, Inc.,* 199 F.3d 6 (1st Cir.1999) and *Florida Seed Co. v. Monsanto Co.,* 105 F.3d 1372 (11th Cir.1997). While both involve settings in which distributors were held not to have antitrust injury, their focus is on manufacturing monopolies, not a distribution market, which differentiates them from the present case.

In *Serpa,* the Court of Appeals for the First Circuit denied antitrust standing to a terminated distributor of plumbing supplies. There, plaintiff's supplier was purchased by defendant, a manufacturer that controlled 85 per cent of the relevant market. Defendant chose to distribute directly through one of the acquired companies, eliminating plaintiff as exclusive distributor. The decision denied antitrust standing because the terminated distributor was neither a consumer nor a competitor of defendant, and the "loss is neither connected with nor resulted from defendant's market power in the [plumbing supply] indus-

The theory endorsed by plaintiffs was rejected by the Court of Appeals for the Second Circuit in *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir.1995)(Winter, now C.J.), on a 12(b)(6) motion.[7] Plaintiffs were a group of independent distributors terminated when defendant took over Seven–Up Brooklyn and instituted a distribution network employing its own drivers. With that acquisition, defendant controlled 62 per cent of the soft drink bottling market in the Metropolitan New York area. In claiming an antitrust injury, plaintiffs framed the issue as the elimination of competition in retail distribution between themselves and defendant. The decision disagreed, stating that "the so-called 'distribution monopoly' is derived entirely from [defendant's] share of the bottling market. [Defendant's] 'distribution monopoly' thus involves only his product. Moreover, a vertically structured monopoly can take only one monopoly profit."

*G.K.A. Beverage Corp.*, 55 F.3d at 767(citing *Lamoille Valley R. Co. v. I.C.C.*, 711 F.2d 295, 318 (C.A.D.C.1983); 3 Areeda and Hovenkamp, Antitrust Law § 725(b) (2d ed.1978))(affirming dismissal of complaint, Fed.R.Civ.P. 12(b)(6)).

The rationale of *G.K.A. Beverage* has been well articulated. "Vertical integration by the monopolist may deprive a former supplier or customer of a trading partner and thus cause injury-in-fact, particularly if that firm has made a significant specialized investment in dealing with the now-integrated monopolist. But this injury is no more an injury to competition when a monopolist integrates than when a competitor integrates." 3 Areeda & Hovenkamp at § 756b.[8]

Plaintiffs counter that they are the direct purchasers or "consumers" for whose benefit the antitrust laws were designed.[9]

---

try." *The Serpa Corp.*, 199 F.3d at 12. Further: "The terminations were an incidental matter which the merger may have made possible, but certainly did not cause." *Id.* In addition, there were other competitors of defendant and high-volume consumers that could challenge the merger in place of plaintiffs. In the court's view, the relevant market was not distribution market, but the market for plumbing supplies.

*Florida Seed Co.* also resulted in a finding that there was no antitrust injury. Plaintiff, a terminated distributor of herbicide, originally had a distribution contract with both manufacturers Ortho and Monsanto, which accounted for 100 per cent of the herbicide market. Under a FTC consent decree, Monsanto, after it acquired Ortho, was to divest itself of the herbicide "Kleenup". Plaintiff, a high-volume seller, argued it was terminated by Monsanto to devalue the "Kleenup" brand prior to divestiture. (Monsanto, as owner of Ortho and its "Roundup" product, would than have to compete with the new owner of the "Kleenup" product.) This decision followed others in denying antitrust standing to terminated distributors after a merger. *Florida Seed*, 105 F.3d at 1375. It held that "the proper parties to challenge Monsanto's acquisition of Ortho are direct purchasers in the herbicide market." *Id.* The case is distinguishable because the court viewed the relevant market as the production of herbicide, not the distribution of herbicide. However,

Monsanto, unlike defendant in *Serpa*, had no competitors at the time of the termination.

7. Plaintiffs have asked for the opportunity to take discovery and suggested that under the cases, a threshold dismissal would be premature. Given the economic configuration of the issues and the precedents for determining the standing issue at this stage, that request will not be granted. *See Alpern v. Cavarocchi*, M.D., P.C., Civ. A. No. 98–3105, 1999 WL 257695, at \*4 (collecting cases dismissing antitrust claims at the pleading stage).

8. Professors Areeda and Hovenkamp reason that there can be no antitrust harm to vertical downstream monopolization by a first-stage monopolist (manufacturer) on several bases: There can be no "double" monopoly profit (monopoly profit is the intersection of its marginal cost curve and its marginal revenue curve (demand curve)); the potential is to lower prices and increase output; and integration can produce economies (efficiencies and lower transaction costs). 3 Areeda & Hovenkamp at § 756.

9. Plaintiffs refer to *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) for the proposition that overcharged distributors as first purchasers have antitrust standing to pursue treble damages—as opposed to the final consumer. However, those cases and their prog-

They urge that the resulting price increase to end users (hospitals and doctors) and reduced quality of customer service constitutes an antitrust injury to competition. In the context of antitrust jurisprudence, these are specious arguments. Plaintiffs resold Origin products to final purchasers, such as hospitals and doctors. Any resulting increase in price or diminution of quality from defendants' entry into and monopolization of the distribution market would be an injury to those consumers, not an antitrust injury to plaintiffs' business or property.

Plaintiffs mistakenly rely on two recent antitrust decisions from our Court of Appeals—*In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395 (3d Cir.2000) and *Angelico v. Lehigh Valley Hospital, Inc.*, 184 F.3d 268 (3d Cir.1999). *Angelico* concerned a surgeon excluded from the cardiothoracic surgery market by a boycott and conspiracy among hospitals and physician groups. *Angelico*, 184 F.3d at 273. He was held to have antitrust standing because " 'the type of injury (loss of income due to an inability to practice in the relevant market) is directly related to the illegal activity in which the defendant allegedly engaged: a conspiracy to exclude [plaintiff] from the relevant market.' " *Id.* at 274–75 (quoting *Brader v. Allegheny General Hospital*, 64 F.3d 869, 877 (3d Cir.1995)). *Angelico* is inapposite because the conspiracy was among rival physicians conspiring with hospitals to prevent plaintiff from competing with them. Here, defendants are vertically-integrated manufacturers, not independent medical supply distribution companies. Plaintiffs' injury, if any, flows from the termination of their distribution contracts, not from defendants' entry into the marketplace.

The second case, *In re Warfarin Sodium Antitrust Litigation*, is also unhelpful to plaintiffs. It held that consumers had standing to sue the manufacturer of a name-brand drug (Coumadin) for excluding the entry of a generic substitute from the market. Significantly, plaintiff class sought injunctive relief: "[T]here is no risk of duplicative recovery because the class only seeks . . . injunctive relief." 214 F.3d at 400. Moreover, the "excess amount paid by Coumadin users not only is 'inextricably intertwined' with the injury [defendant] aimed to inflict, the overcharge was the aim of [defendant's] preclusive conduct." *Warfarin* distinguished the "indirect purchaser" doctrine of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)(direct purchasers and not indirect consumers are the proper party to challenge a manufacturer's illegal overcharge), and approved a class of consumers to proceed against the manufacturer. The relief requested in the present case includes money damages and does not involve a claim for overcharge to the end user.

Because the amended complaint does not allege that an antitrust injury was sustained by plaintiffs, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. at 697, the amended complaint must be dismissed.

An order accompanies this memorandum.

### *ORDER*

AND NOW, this 15th day of August, 2000, the motion of defendants Tyco International, Ltd. and U.S. Surgical to dismiss the amended complaint is granted, Fed.

---

eny involve the standing of distributors that are forced to pay higher prices and that in turn pass them on to consumers. The rule thereby created prevents both levels—distributors and consumers—from recovering duplicate and inconsistent judgments. *See* 2 Areeda & Hovenkamp, at ¶ 371. Here, there is no overcharge issue because the distributors no longer deal in defendants' products. The only potential down-stream victim of a monopoly overcharge would be hospitals and doctors purchasing directly from the manufacturer. *See In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395, 401 (3d Cir.2000).

R.Civ.P. 12(b)(6), and this action is dismissed.