McCann, J.
INTRODUCTION
The plaintiff, Anglo Fabrics Company, Inc. (“Anglo Fabrics”) is represented by David J. Officer, Esq., Fletcher, Tilton & Whipple, 370 Main Street, Worcester, Massachusetts 01608. The defendant, Town of Webster (“Webster” or “Town”) is represented by William Hewig, III, Kopelman & Paige, 31 St. James Avenue, 7th Floor, Boston, Massachusetts 02116-4102. Anglo brings this complaint in the following five counts: (I) Declaratory Judgment; (II) Breach of Contract; (III) Injunctive Relief (waived by the plaintiff and therefore count III is dismissed); (IV) Declaratory Judgment; and (V) Enterprise Fund.
Webster filed an answer of general denial and raised the following six affirmative defenses: (1) laches; (2) good faith; (3) failure to state a claim; (4) lack of jurisdiction; (5) improper service; and (6) statute of limitations.
FINDINGS OF FACT
After hearing and upon all of the credible evidence, this Court makes the following findings of fact and rulings of law.
Plaintiff, Anglo Fabrics, was a wool manufacturing company located in the town of Webster, Massachusetts from a period of time prior to 1950. Anglo Fabrics stopped doing business in April of 1999.
The wool manufacturing process required Anglo Fabrics to draw large quantities of water, millions of gallons each year, from the French River for its manufacturing process. The French River coursed through the Town of Webster. Prior to 1972, Anglo Fabrics discharged the water it used for manufacturing directly into the French River. It was essentially untreated.
Early in 1950, Webster built and operated a wastewater treatment plant to provide primary wastewater treatment to those residences, businesses and institutions which passed wastewater through the Town’s so called' “collection system” to its primary treatment plant. A primary treatment plant, otherwise known as a “gravity treatment” plant, is a process wherein waste water runs through a treatment plant and the solids in the water simply settle. The remaining water is then discharged, in this case, into the French River.
Wastewater would, travel from various points of origin in the Town through a configuration of pipes commonly referred to as the “collection system,” to the plant. The collection system consists of a series of pipes of smaller diameter (“lateral pipes”) which are installed in streets in those sections of Webster which have sewers. The lateral pipes empty into larger pipes which eventually empty into the main pipes. The main pipes feed into a larger twenty inch diameter pipe known as “inceptors.” The inceptors drain into the primary treatment plant. There, the water would then be treated as described above, and discharged directly into the French River.
Prior to 1972 Anglo Fabrics did not send its manufacturing process wastewater to the Webster wastewater treatment plant. It simply discharged its industrial wastewater into the French River.
However, Anglo Fabrics did separately use water supplied by the Town for domestic use, including sinks, showers and toilets. Anglo Fabrics sent that latter domestic use wastewater through the Town’s collection system to the Town wastewater treatment plant.
In the late 1960s, federal and state government agencies, namely the Federal Environmental Protection Agency (“EPA”) and the Massachusetts Department of Environmental Quality Engineering (“DEQE”), required Anglo Fabrics and Webster to improve the quality of the wastewater being discharged into the French River. Federal and state agencies required Webster to upgrade the town waste treatment plant from a primary treatment plant to a secondary waste treatment plant.
A secondary wastewater treatment involves filtering solids from the wastewater, as opposed to simply letting the solids settle. The same governmental agencies also notified Cranston Print Works, Inc., as well as Anglo Fabrics, both large volume users of water, that they must treat their industrial wastewater before discharging it into the French River.
Consequently, Webster planned to construct its own Secondary Wastewater Treatment Plant (“Secondary Plant”) in order to comply with these heightened standards.
Anglo Fabrics initially planned to construct its own individual secondary wastewater treatment plant to treat and process its own industrial wastewater, as opposed to tying into Webster’s collection system and utilizing the Secondary Plant of the Town. However, in 1972 Town and EPA officials persuaded Anglo Fabrics to abandon those plans and instead tie into the Town’s Secondary Plant even though Anglo Fabrics had a design prepared and had obtained estimated construction costs.
Prior to 1971, Webster paid for the operations and maintenance of its collection system through general revenues raised by taxation. In 1971, Webster commenced a fee-based system for payment of costs associated with treatment of waste delivered to its collection system and treatment plant. Users connected to the treatment plant through the sewerage *235 collection system were assessed a fee for collection and treatment. The rate charged was fifty-one percent of the user’s water bill. Anglo Fabrics paid a user fee under the 1971 user charge system, but only the minimal amount for its domestic use wastewater, i.e. sinks, toilets, etc. Anglo Fabrics did not pay for its industrial process wastewater discharged into the French River.
Anglo Fabrics and Webster signed an agreement in May of 1972. The agreement is the central issue to the facts of this case. The agreement (“1972 Agreement”) provided the Town would construct the Secondary Plant and Anglo Fabrics would utilize the Secondary Plant to treat its process wastewater. Under the 1972 Agreement, Anglo Fabrics was required to:
a. build and pay for pre-treatment and collection facilities for the delivery of process wastewater from the Anglo Fabrics plant to the Secondary Plant;
b. control the strength and rate of the flow of wastewater into the Secondary Plant;
c. pay Webster on a monthly basis for the actual costs of treating the process wastewater, industrial and domestic, delivered from Anglo Fabrics to the Secondary Plant;
d. pay Webster a surcharge per pound for the costs of treating process wastewater that contained Biological Oxygen Demand (“BOD”) loading greater than an established benchmark; and
e. pay 19.135% of Webster’s “out-of-pocket” costs for construction of the Secondary Plant, either in one lump sum or in installments.
Under the 1972 Agreement, Webster was required to:
a. accept Anglo Fabric’s water, subject to strength and quality limitations;
b. construct the Secondary Plant with facilities sufficient to accept and treat Anglo Fabrics’s process wastewater;
c. measure Anglo Fabrics’s process wastewater flows;
d. treat Anglo Fabrics’s process wastewater, including removal of BOD.
By the terms of the agreement the parties further mutually agreed:
(a) Webster would not be liable for any discharge of processed wastewater which exceeded the contractual criteria;
(b) In the event that another industrial user later tied into the Town’s treatment plant, equitable adjustments would be made for both the operation and maintenance costs and capital costs of the treatment plant;
(c) Webster could discontinue service to Anglo Fabrics, after notice, if Anglo Fabrics left any bill unpaid for more than sixty days.
The 1972 Agreement is silent as to its duration or termination. The Agreement concludes by stating that “said agreement shall be binding upon and inure to the benefit of the respective successors and assigns.”
After reaching the 1972 Agreement with Anglo Fabrics, Webster constructed the Secondary Plant. Pursuant to the 1972 Agreement Anglo Fabrics paid 19.135% of Webster’s “out-of-pocket” costs (i.e., construction costs not reimbursed by state and federal grants, including the costs of borrowing funds for construction) for construction of the Secondary Plant. Anglo Fabrics paid in installments, making its final payment in April of 1984. Anglo Fabrics was not required to pay for the operation and maintenance of Webster’s collection system under the agreement.
The operation and maintenance costs for the collection system were totaled separately and were charged only to domestic wastewater customers. Anglo was a limited domestic user and it paid for the collection system derived from its limited domestic use. It did not pay operation and maintenance costs for its manufacturing process wastewater.
Pursuant to the terms of the 1972 Agreement, Anglo Fabrics constructed its own pretreatment and collection facilities to deliver its process wastewater, both domestic and industrial, to Webster’s collection system.
Prior to the 1972 Agreement, in 1971, Webster commenced a fee-based system for payment of costs associated with treatment of wastewater delivered to its collection system and treatment plant. To calculate the per-gallon rate paid by Anglo Fabrics for process wastewater it contributed to the Secondary Plant, Webster divided the Plant’s total budget (minus the costs of removing excess BOD, for which a surcharge was billed) by the number of gallons treated. Anglo Fabrics was not required to pay for the operation, maintenance or other costs associated with Webster’s collection system. Through the 1970s, Webster did not charge Anglo Fabrics under the 1972 Agreement for any of the costs of the collection system.
The 1972 Agreement was subsequently amended twice. First in January 1973, the parties agreed to further restrictions on the volume of Anglo's wastewater flow to the treatment plant particularly in times of low water flow in the French River; limitations on the strength of the wastewater; and fines were established for violations. The parties further agreed by that first amendment that if there was unused capacity in the treatment plant, Anglo could use the excess capacity if it wished; Anglo was to provide a flow recorder as provided in the 1972 Agreement; and the period for which an estimated sewer rate charge as opposed to a rate based on measured flows and proven costs, was to be used for billing was reduced from three years to the time it took to obtain actual figures.
*236 In July of 1974, the 1972 Agreement was amended a second time. The amendment gave Webster access to the flow measuring equipment on Anglo’s property at anytime; it fixed at six months the interim period for which estimates could be used to calculate rates; and it limited the circumstances under which Anglo’s capital cost contribution for the 1972 plant upgrade could be reduced by the addition of other industrial users of the treatment plant. The 1972 Agreement, as amended, excluded costs for operation and maintenance of Webster’s collection system even though Anglo used Webster’s collection system on a minimal basis for its so-called domestic use. Both amendments were written.
In fiscal 1982, Webster continued its policy of not charging Anglo under the 1972 Agreement, as amended, for any of the costs of Webster’s wastewater collection system. The rate charged to Anglo for its process wastewater treated at the Webster plant (per million gallons of water) was calculated by dividing the total of the treatment plant expenditures adjusted to exclude costs of removing excess pollutants (for which a surcharge was billed) by the gallons treated. The costs to operate and maintain the collection system were separately totaled and were charged only to domestic wastewater customers. Anglo did not pay any portions of operation and maintenance costs of Webster’s collection system under the 1972 Agreement, or its amendments, between the years 1972 and 1983.
In 1983, Anglo Fabrics and Webster reached an agreement (unsigned) through which Anglo Fabrics would pay a portion of the operations and maintenance of the Town’s collection system. This was a new charge and one which Anglo Fabrics had not previously paid. Known as an Industrial Collection Charge (“ICC”), the payment was based on: (1) the portion of the collection system actually used by Anglo Fabrics, as measured by Anglo Fabrics’s use of the capacity of the “interceptor pipe” that received Anglo Fabrics’s process wastewater; and (2) a portion of the cost to treat infiltration and inflow waters that entered the collection system through the “interceptor pipe.” “Infiltration" is defined as water other than wastewater that enters a sewer system (including service connections and foundation drains) from the ground through such means as defective pipes, pipe joint connections or manholes. “Inflow” is defined as water other than wastewater that enters a sewer system (including sewer service connections) from such sources as, but not limited to, roof leaders, cellar drains, yard drains, area drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, cooling towers, storm waters, surface runoff, street wash waters or drainage. Both infiltration and inflow are waters which are treated at a treatment plant but which are not chargeable to any particular or identifiable user.
About the same time, i.e., in the early 1980s, Anglo Fabrics agreed to pay the additional and new charge for the collection system. Anglo Fabrics agreed to pay charges associated with its domestic use wastewater based on an assumed flow. It was assumed that each employee used fifteen gallons per day and worked two hundred and sixty days per year. Anglo paid for domestic use water collection and treatment based on this assumed domestic use. Between 1972 and 1983 Anglo paid no portion of the operations and maintenance of Webster’s collection system as part of its process wastewater charges, but did pay for those charges after 1983 as just outlined.
By the formula proposed by Webster and agreed to by Anglo Fabrics in 1983 for the ICC, Anglo Fabrics paid for the use of one-half (V2) mile of Webster’s thirty-seven mile collection system, or 1.351% of the operations and maintenance costs of the total collection system of the Town.
Anglo Fabrics agreed to pay the ICC in addition to the charges contained in the 1972 Agreement, as amended. Webster and Anglo Fabrics did not reduce the ICC to the form of a written contractual agreement, and did not amend the 1972 Agreement by written amendment to include the ICC.
Federal and State water standards were becoming increasingly more rigorous as the years passed. Webster was not sufficiently able to treat wastewater through the secondary treatment plant to meet State and Federal regulations. Webster became aware that its then existing treatment plant, the secondary treatment plant, would not be adequate to meet State and Federal water quality requirements. During the 1980s, there were substantial changes to federal laws regulating the treatment, storage and disposal of solid waste and wastewater sludge, including limits on land disposal of waste and increases in the level of treatment required for sludge and solid wastes. Specifically, the Clean Water Act, 33 U.S.C. §§1251-1387, required additional types and higher levels of pretreatment, as well as advanced levels of treatment of wastewater.
Consequently, Webster upgraded the Secondary Plant in 1983 at a cost of $3.5 million by providing sludge handling capabilities at the plant. Despite this upgrade, the Secondary Plant failed to comply with heightened Federal and State environmental protection regulations enacted during the 1980s.
In 1986, the Federal Environmental Protection Agency (“EPA”) and the State Massachusetts Division of Environmental Quality Engineering (“DEQE”) sued Webster and the neighboring Town of Dudley (“Dudley”), Massachusetts, in the United States District Court for the District of Massachusetts. The suit alleged that the Towns violated: (1) the federal Clean Water Act, 33 U.S.C. §1311; (2) the Massachusetts Clean Water Act, G.L.c. 21, §26; and (3) the National Pollution Discharge Elimination System (“NPDES”) *237 permit issued pursuant to 33 U.S.C. §1342. The suit further alleged that Webster had violated an administrative order issued pursuant to 33 U.S.C. §1319.
The suit sought to compel Webster and Dudley to upgrade their respective secondary treatment plants so as to bring them into compliance with the heightened Federal and State environmental protection regulations enacted in the 1980s.
The suit was resolved through a Consent Decree (“Consent Decree") entered onto the docket of the United States District Court for the District of Massachusetts on October 29, 1987. The Consent Decree required Webster and Dudley to construct a new Regional Advanced Wastewater Treatment Facility (“AWWTF”), which would provide joint treatment of wastewater from Webster and Dudley and bring both Towns into compliance with the heightened environmental protection regulations.
Pursuant to the consent decree, Webster and Dudley entered into a “Intermunicipal Agreement.” Under the agreement, Dudley was to pay: (1) a portion of the capital or construction costs not covered by State or Federal grants (17%); (2) pay monthly for wastewater treatment based on actual flow delivered by Dudley to Webster, and the actual cost to treat one million gallons of sewerage and waste of standard strengths; and (3) a surcharge for treatment of excess BOD or “loading.” Under the Intermunicipal Agreement, Dudley was not required to pay for operation, maintenance or repair of Webster’s collection system as Dudley was responsible for its own collection system prior to delivery of its works to the inflow to the treatment plant in Webster.
The Consent Decree further required Webster and Dudley to establish and implement an Industrial Pretreatment Program (IPP) in compliance with 40 C.F.R. §§403.8 and 403.9. This required each Town to adopt sewer use ordinances, rules and regulations as mandated by 40 C.F.R. §403.9(b)(2). Webster was additionally required to issue wastewater discharge permits to all “Significant Industrial Users.” Anglo Fabrics was deemed a significant industrial user.
In 1987, Meredith Zona (“Zona”) was Webster’s wastewater engineer consultant. In order to comply with the Consent Decree, Zona formulated for the Town of Webster a new rate structure for all users of the Town’s sewer system. The Consent Decree did not require Webster to adopt a particular type of user charge system. However, the charge system ultimately had to comply with EPA regulations. Toward that end, Zona drafted .the new Sewer User Charge System in conformity with EPA guidelines as contained in a document titled “User Charge Guidance Manual.”
Working closely with Sewer Superintendent Philip Robert (“Robert”), Zona designed the Sewer User Charge System so as to equitably distribute capital and operation/maintenance costs of the Regional Advanced Treatment Facility, as well as the Town’s collection system, to all users in proportion to their actual use of the new sewer system.
EPA regulations required that if a charge system based on actual use was adopted, the charge system must provide that each user or class of users pay its “proportionate share of operation and maintenance (including replacement) cost of treatment works within the grantee’s service area ...” EPA regulations defined “treatment works” so as to include the Town’s collection system, not just the Regional Advanced Treatment Facility.
The new Sewer User Charge System therefore conflicted with the 1972 Agreement between Webster and Anglo Fabrics, under which Anglo Fabrics was not charged any portion of the costs (operation, maintenance and repair) associated with the collection system. Under the proposed new Sewer User Charge System, Anglo Fabrics would be charged a portion of the collection system’s costs (operation, maintenance and repair), associated with the collection system. That portion would now exceed the ICC (1.351 % of the operations and maintenance costs of the collection system) previously voluntarily agreed to by Anglo Fabrics in 1983.
The new Sewer User Charge System contained a mechanism for recovery of treatment costs for nitrogen and phosphorous from all users proportionately to their use. Although this recovery mechanism complied with EPA regulations, the 1972 Agreement between Webster and Anglo Fabrics contained no such mechanism. It was a newer concept in the evolving process of sewer treatment.
The Sewer User Charge System provided for proportionate recovery of so-called “infiltration/inflow” or “I/I” costs. Again, this complied with EPA regulations but varied from the 1972 Agreement between Webster and Anglo Fabrics.
The DEQE reviewed the proposed Sewer User Charge System and found it compliant with EPA requirements.
Zona also drafted a new set of Sewer Use Regulations for Webster. Zona again consulted with Superintendent Robert in drafting the new Sewer Use Regulations. Much of the language in the new Sewer Use Regulations was borrowed from or based upon language in the EPA’s “User Charge Guidance Manual for Publicly-Owned Treatment Work.” The Sewer Use Regulations required annual user charges to be calculated in accordance with the Sewer User Charge System adopted in June of 1987.
The EPA reviewed and approved the new Sewer Use Regulations as compliant with EPA regulations and the Consent Decree.
Construction costs for the AWWTF were estimated at $40 million. After the EPA and DEQE approved the proposed Sewer User Charge System and Sewer Use *238 Regulations as compliant with EPA regulations, Webster received a non-reimbursable grant from both agencies covering between 82-85% of the $40 million cost for the facility. Webster would therefore bear the costs of approximately $8 million dollars of the $40 million for the cost of the facility.
The Webster Board of Selectmen then voted to adopt the Sewer User Charge System in June of 1987. The Board subsequently voted to adopt the new Sewer Use Regulations, which incorporated the Sewer User Charge System, on September 22, 1987.
The Sewer Use Regulations were published in their entirety in Webster’s town newspaper, the “Webster Times," on September 30, 1987. The publication stated that the Sewer Use Regulations would go into effect as of October 9, 1987.
Section 1, paragraph 1.1 of the Sewer Use Regulations states: “These Regulations also supersede any contract or agreement between the Town of Webster and industry.”
Section 11 of the Sewer Use Regulations states that any contracts or agreements with industry which were “inconsistent or conflict with” the Regulations were “repealed to the extent of such inconsistency or conflict.”
Zona and the Board of Selectmen intended this language to terminate the 1972 Agreement between Webster and Anglo Fabrics.
As required by the Consent Decree, Zona sent a draft of Anglo Fabrics’s wastewater discharge permit to the company on February 25, 1988. The draft contained a complete set of the Town’s new Sewer Use Regulations.
Anglo Fabrics received its final and official wastewater discharge permit on June 28, 1988. This permit became effective July 1, 1988, the same date upon which calculations of sewer user charges under the new Sewer User Charge System began. July 1, 1988 marked the beginning of Webster’s 1989 fiscal year.
In 1989, Webster adopted an “Enterprise Fund” (“the Enterprise Fund”) for treatment for its wastewater treatment facility. The Enterprise Fund collects revenue from those individuals and industries which have their wastewater treated through the treatment plant. The number of individuals and industries who have their water treated and contribute to the Enterprise Fund are a fraction of the number of total residents of the Town of Webster. The rest of the residents have septic systems. Since 1989, Webster has extended its collection system to more than four hundred additional users.
The Enterprise Fund assessed betterments and bore the costs of the collection system expansion. Design expenses and other “soft costs” for these projects were paid by the Enterprise Fund without reimbursement. The Enterprise Fund has also paid all debt service on each project until betterments have been assessed to and collected from property owners. The Enterprise Fund has been assessed one-third of the entire cost of the betterments. Property owners have paid two-thirds of the cost (prior improvements were apportioned two-thirds to property owners receiving the benefit of the improvement and one-third to Webster’s general fund). Anglo has paid substantial amounts to the Enterprise Fund. In effect, the changed betterment policy shifts costs of the collection system expansion from all taxpayers to those who were assessed by the Enterprise Fund.
Between the years 1989 and 1999, had Anglo been strictly and solely charged under the 1972 Agreement, as amended, it would have paid ICC charges each year of 1.351% (%7) of the collection system costs. The collection cost, as opposed to the ICC costs, for the years in question are as follows:
Fiscal Year Collection Costs (@ 1.351% Anglo ICC
1989 108,666.93 1.468.09
1990 138,006.37 1,864.47
1991 145,671.96 1,968.03
1992 191,314.42 2,584.66
1993 359.982.90 4,863.37
1994 392.382.90 5.301.09
1995 392.382.90 5.301.09
1996 614,574.19 8,302.90
1997 799,414.03 10,800.08
1998 1,036,414.72 14,001.96
1999 169,495.39 2.289.88
Total 58,745.62
The difference between the two, i.e., Collection Costs vs. ICC charges, is $1,278,765.00.
Recalculating the rates Webster charged the Town of Dudley, which did not include costs of the collection system, would result in the equivalent charge to Anglo by the Town of Webster:
Fiscal 1989 $ 43,295.65
Fiscal 1990 43,648.22
Fiscal 1991 109,734.74
Fiscal 1992 87,145.09
Fiscal 1993 146,813.28
Fiscal 1994 245.982.16
Fiscal 1995 154,103.73
Fiscal 1996 181,231.25
Fiscal 1997 162.180.16
Fiscal 1998 162,588.10
Fiscal 1999 788.75
Total $1,337,511.00
As of July 1, 1998, Anglo Fabrics was billed under the new Sewer User Charge System on a monthly basis. Based on Anglo Fabrics’s share of the wastewater treated at the Regional Advanced Treatment Facility, Webster charged Anglo Fabrics for a proportionate share of the costs associated with the operation and maintenance of the Regional Advanced Treatment Facility and the collection system-. Anglo had paid none of the operating costs until 1983. In 1983, Anglo Fabrics voluntarily agreed to pay a portion of the operation costs under the ICC as previously outlined. *239 Under the new assessment Anglo Fabrics paid for a greater share of the costs associated with the collection system than the share of the collection system Anglo Fabrics actually used.
Anglo Fabrics informed Webster of the company’s belief that the Town had violated the 1972 Agreement in a letter dated October 5, 1993, from Alfred Nation, Vice President of Anglo Fabrics, to Roy Mier of the Webster Board of Selectmen.
I find that it was the intent of the parties in 1972 that the 1972 Agreement continue and be applicable during such period of time as Webster maintained a secondary treatment plant. I further find that the intent of the parties in 1973 and 1974 when the 1972 Agreement was amended in writing, was that the agreement continue to be applicable during such time as Webster maintained a secondary treatment plant. I further find that in 1983, when the parties orally agreed to amend the agreement, the Town upgraded the secondary plant and Anglo Fabrics agreed to pay the ICC charges and thus, as further amended, I find that it was the intent of the parties that the agreement continue to be applicable during such time as Webster maintained an upgraded secondary water treatment plant.
RULINGS OF LAW
In order to recover for breach of contract against a Town, Anglo Fabrics has the burden of proving that a valid contract existed between it and the Town. Mass. General Hospital v. Revere, 385 Mass. 772, 774 (1982).
The essential elements of a contract must be sufficiently definite so that the nature and extent of the parties’ obligations can be ascertained in order for a contract to be enforceable. Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F.Sup. 404, 417 (D.Mass. 1995), quoting Simons v. American Dry Ginger Ale Co., 335 Mass. 521, 523 (1957).
If terms of a contract are ambiguous, a contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intentions of the parties. State Line Snacks Corp. v. Town of Wilbraham, 28 Mass.App.Ct. 717, 721 (1990).
A contract should be construed as one terminable at will by either party upon reasonable notice where the ambiguity is created by the absence of a term of duration. Mass Cash Register, 901 F.Sup. at 417.
A contract which does not have a duration of term clause is not presumed to last in perpetuity or for an extended number of years unless there is an express term to that effect. Town of Oak Bluffs v. Cottage City Works Co., 235 Mass. 18, 24 (1920).
There is no provision in the Contract between Anglo Fabrics and Webster which specifies when it would be terminated. Cf. Phelps v. Shawprint, Inc., 328 Mass. 352 (1952).
The Town of Webster’s new Sewer User Regulations were properly adopted by vote of the Board of Selectmen on September 22, 1987. The regulations were published in the Webster Times on September 30, 1987 in compliance with M.G.L.c. 83, §10, andbytheir own terms, became effective 10 days later, or October 9, 1987.
Webster’s Sewer Use Regulations, contained a provision at paragraph 1.1 stating: “These regulations also supersede any contracts or agreements between the Town of Webster and industry.” This provision effectively served as the Town’s unilateral termination of the 1972 contract between Webster and Anglo Fabrics.
What is reasonable notice to support the termination of a contract “depends upon all the circumstances surrounding that particular contract.” Lord's & Lady’s Enterprises, Inc. v. John Paul Mitchell, 46 Mass.App.Ct. 262, 265 (1999). The adequacy of notice is generally coextensive with the amount of harm that can be proved. Teitelbaum v. Hallmark Cards, Inc., 25 Mass.App.Ct. 555, 561 (1988). Anglo Fabrics has the burden of showing that its “injuries resulted from inadequate notice of termination.” Serpa Corp. v. McWane, Inc., 199 F.3d 6, 14 (1st Cir. 1999) (interpreting Massachusetts law). Where a party alleges a lack of notice, it must show that the alleged inadequacy of the notice resulted in prejudice. Finkel v. Natale Rota, Inc., 19 Mass.App.Ct. 55, 57-58 (1984); City Council of Waltham v. Board of Appeals of Waltham, 5 Mass.App.Ct. 773 (1977).
The Town of Webster’s notice to Anglo Fabrics of its unilateral termination of the 1972 contract was reasonable under the circumstances. In the context of an ordinary commercial contract, “reasonable notice under the circumstances” would mean providing the terminated party with sufficient time to find alternatives to the contract. See Serpa Corp., 199 F.3d at 14. In this case, however, Anglo Fabrics had no alternative to its continuing use of Webster’s wastewater treatment facility. Webster’s unilateral notice of termination did not terminate Anglo Fabrics’ use of the wastewater treatment facility, but only terminated the then-current rate calculation arrangement. Compare Cherick Distributors, Inc. v. Polar Corp. 41 Mass.App.Ct. 125 (1996).
With respect to rate setting alternatives, Anglo Fabrics had two remedies. First, it had participated in public hearings and meetings regarding the new AWWTF, including negotiations to set aside reserve capacity for its future growth. Its participation in those negotiations, as well as its prior history of negotiating changes to its payment arrangements suggests that it could have negotiated further changes to the regulations, consistent with EPA guidelines, had it undertaken to do so. Secondly, Anglo Fabrics could have availed itself of the abatement procedures which had been adopted by the Town in 1983, but again it failed *240 to do so. Based on these considerations, the notice given to Anglo Fabrics regarding the change in its rate calculation arrangements was compliant with the statute, and was reasonable under the circumstances.
The alleged harm claimed by Anglo Fabrics is harm due to the lawful unilateral termination of the contract by the Town in passing its 1987 Sewer Use Regulations, and is not harm which is related to the notice given. Serpa, 199 F.3d at 14.
Anglo Fabrics knew of the proposed charges for at least two years before the price increase went into effect, but it took no action to protect its interest in the contract. Anglo Fabrics ignored the proposed changes; it did not object or offer input; and it must accept the consequences. Commonwealth v. Olivio, 369 Mass. 62 (1975).
The Town is not estopped from terminating the contract because estoppel will not lie against a town. Cranberry Growers Services, Inc. v. Duxbury, 415 Mass. 354, 356 (1993).
Anglo Fabrics did not fully perform its obligations under the contract so as to require further performance by the Town. The contract remained executory on the part of both parties. For its part, the Town had a continuing obligation to accept wastewater from Anglo Fabrics, process and treat it. With respect to its part, Anglo Fabrics had an ongoing obligation to pay for such treatment. Cf. State Line Snacks Corp. v. Wilraham, 28 Mass.App.Ct. 717, 722 (1990).
The rescission of the contract through the enactment of the Regulations does not constitute an impairment of contractual obligations in violation of the Contract Clause of the United States Constitution because (1) Anglo Fabrics had no reasonable expectation that the Contract would last in perpetuity, Local Division 589, Amalgamated Transit Union, AFL-CIO, CLC v. Commonwealth, 666 F.2d 618, 641 (1st Cir. 1981); (2) the plaintiff knew or reasonably should have known that wastewater treatment is a heavily regulated industry that was subject to change, Mercado Boneta v. Administracion del Fondo Compensacion al Paciete, through Insurance Commissioner of Puerto Rico, 125 F.3d 9, 13 (1st Cir. 1997); and (3) the Contract Clause does not require the Town to adhere to a contract that surrenders an essential attribute of its sovereignty, i.e., rate making, Local Division 589, 666 F.2d at 641, quoting United States Trust Co. v. New Jersey, 431 U.S. at 23.
Even if there was a “substantial impairment” of a reasonable contract expectation, and this Court does not so find, there is no Contract Clause violation because the enactment of the 1987 Sewer Use Regulations, and its accompanying Sewer Use Regulations, and their accompanying User Charge System, was reasonably necessary to serve the important public purpose of: (1) complying with the Consent Decree of the United States District Court dated October 1987; (2) complying with the governing EPA regulations which established an Industrial Pre-Treatment Program (“IPP”); and (3) selecting an appropriate User Charge System, complaint with EPA regulations, which would allow the DEP, as the grant administering agency, to award to the Town grants totaling between 82-85% of the construction costs. These factors constitute reasonable necessity to serve an important public purpose. McLean v. State Board of Retirement, 432 Mass. 339, 344 (2000). Because the enactment of these regulations and the User Charge System was reasonable and necessary to serve an important public purpose, there is no Contract Clause violation. Id.
The Town was required to adopt a User Charge System complying with EPA standards in order to qualify for a grant from the United States Environmental Protection Agency (“EPA”). 33 U.S.C. §1284(b).
If a User Charge System was adopted by the Town based on actual use, such a User Charge System must provide that each user or class of user pay its “proportionate share of operation and maintenance (including replacement) costs of treatment works within the grantee’s service area . . .” 40 C.F.R. §35.929-(1a). “Treatment works" is defined by the EPA in its User Charge Guidance Manual for Publicly-Owned Treatment Works to include the collection system. Accordingly, if a User Charge System based on actual use was adopted, as was the case with Webster, such system must provide that each user or class of users pay a proportional share of operation and maintenance costs for the treatment works and the collection system.
The Webster User Charge System adopted in 1987 as part of the new Sewer Use Regulations provided for proportionate share of operation and maintenance costs of treatment works and collection systems, and were therefore compliant with federal regulations. 40 C.F.R. §35.929-(1a).
The EPA’s grant requirements do not unconstitutionally impair Anglo Fabrics’ right to contract. City of New Brunswick v. Borough of Milton, 686 F.2d 120, 133-35 (3rd Cir. 1982).
The User Fee was required to distribute the operation and maintenance costs to each user in proportion to its actual contribution to the system by taking into account the strength, volume and delivery flow of each user. 40 CFR 35.929-1(a); 40 CFR Pt. 35, Subpt. E, App. B(g).
Once the Town adopted such a User Fee, such fee structure would take precedent over the terms and conditions of any preexisting agreements between the Town and any users, including industrial users, which addressed the charges to be collected by the Town in providing access to its sewer system, and which might be inconsistent with the Federal grant requirements. 40 CFR 35.929-2(g).
The Town enacted its User Charge System in order to qualify for an EPA Grant.
*241 The Town enacted its Sewer Use Regulations in 1987 in order to .comply with the Consent Decree ordered by the United States Court for the District of Massachusetts in October 1987.
The rate calculation mechanism of the 1972 Contract does not comply with the EPA regulations.
The User Charge System in the Sewer Use Regulations supersedes and renders null and void the terms of the 1972 Contract.
Anglo Fabrics is estopped from denying that it is responsible for paying the Town’s user fee pursuant to the Regulations because it acquiesced to the user fee by not only paying them for several years without complaint, but also by participating in annual consultations with the Town’s rate-setting authorities. See Ucello v. Golden Foods, Inc., 325 Mass. 319, 328 (1950).
Dramatic changes in the federal and state environmental laws, orders from federal and state environmental agencies, and large scale increases in the size of the system constitute changed circumstances for which there was no additional consideration to justify continuing the obligations of the parties under the 1972 Contract. Where the circumstances surrounding the contract are changed, and the parties do not agree upon new consideration, the contract should be considered terminated. Glazer v. Lerman, 330 Mass. 673, 675 (1953).
Contracts should not be construed in a manner which would violate public policy, State Line Snacks, 28 Mass.App.Ct. at 722, as such a construction would render the contract void and unenforceable. Reynolds v. Owen, 328 Mass. 451, 454 (1952).
The 1972 contract is void as against public policy because if the contract were still binding upon the Town, Anglo Fabrics would receive the following windfall: (1) it would have no obligation to pay for any capital costs of the $40 million dollar AWWTF; and (2) it would have no obligation to pay for a disproportionate share of operation and maintenance costs of the plant and of the collection system, as required by federal regulation; and (3) it would have no obligation to pay for treatment costs of nitrogen, phosphorus and infiltration/inflow, as also required by the 1984 EPA regulations.
The Massachusetts Appeals Court’s decision in State Line Snacks Corp. v. Town of Wilbraham, 28 Mass.App.Ct. 717 (1990), compels judgment in favor of the Town.
Dramatically changed circumstances between 1972 and 1987 mean that the 1972 contract was, as a matter of law, no longer enforceable after 1987. These changed circumstances were not foreseen by the parties in 1972, or under the 1972 Agreement as amended. They include: (1) stricter environmental laws and regulations, beginning about 1984, which required upgrading Webster’s secondary wastewater treatment plant to an Advanced Wastewater Treatment Facility; (2) a suit brought by the United States Environmental Protection Agency and Massachusetts DEQE against the Town of Webster and Dudley, obligating the Webster to upgrade its treatment plant to an AWWTF, and include the Town of Dudley; (3) the legal obligation to spend up to $40 million dollars to construct an Advanced Wastewater Treatment Facility; (4) new regulations from the EPA, beginning in 1984, which required the treatment costs for nitrogen, phosphorus and infiltration/inflow be proportionately distributed to users, and which required that operation and maintenance costs for the plant and the collection system be proportionately distributed to all users;
(5) grant requirements for 82-85% of the construction costs of the AWWTF obligating the Town to select a User Charge System from options specified by EPA regulations, none of which corresponded to the rate calculation mechanism set forth in the contract; and (6) increases in operation and maintenance costs between 1972-74 and 1992-98 of over ten times the annual rate of inflation during the same corresponding years. Additionally, Webster’s sewer system grew by over 200 additional units connected. These vastly changed circumstances are sufficient to make the 1972 contract unenforceable because had the Town known that such obligations would arise in the future, it “would defy common sense to think that the Town would ever have signed [the 1972 Agreement].” State Line Snack Corp. v. Town of Wilbraham, 28 Mass.App.Ct. 717, 720 (1990).
The Massachusetts Appeals Court’s decision in State Line Snacks Corp. v. Town of Wilbraham, 28 Mass.App.Ct. 717 (1990), allows the court to look at the “constructive intent” of the parties in determining how long a contract should be enforceable. In stating as it does that had the parties foreseen the scope and extent of vastly changed future circumstances it “would defy common sense that to think that the Town would ever have signed [the 1972 Agreement],” id. at 722, the Appeals Court said that some degree of future changed circumstances can be inferred to have been beyond the probable intent of the parties, and had they been known, would have resulted in a different contractual arrangement, or no contractual arrangement at all. State Line Snacks Corp. v. Town of Wilbraham, 28 Mass.App.Ct. at 722.
The 1983 Webster annual Town Meeting voted to accept the provisions of G.L.c. 83, §§16(A)-(F).
M.G.L.c. 83, §16(A) states that a Town Clerk must file an acceptance of Chapter 83, Section 16(A)-(F). The wording of the statute is ambiguous as to exactly when the certificate must be filed. The plaintiff claims that the certificate was supposed to have been filed shortly after the adoption of the statute by annual Town Meeting in 1983. Another possible interpretation is, however, that a certifícate of acceptance is to be filed *242 against the property of the person whose unpaid bills are to be treated as a lien. Although there is no evidence that the Town of Webster made such a filing at the time of the adoption of the statute, it is unnecessary to determine which interpretation is correct because, even if a filing should have been made in 1983, the Town’s failure to do so was a trivial procedural defect which may be overlooked. Hallemborg v. Town Clerk Billlerica, 360 Mass. 513 (1971).
General Laws Chapter 83 sets out a comprehensive and uniform statutory scheme of administrative appeals and judicial review for those who claim to be aggrieved by the imposition of a sewer user fee. See G.L.c. 83, §§16A et seq. Specifically, a.sewer user fee that is not paid on the original due date becomes a lien on the property being served by the sewer. G.L.c. 83, §§16A, 16B. A person aggrieved by the imposition of such a lien “may apply for an abatement thereof by filing a petition with the board or officer having control of the sewer department . . .” G.L.c. 83, §16E. The procedure for filing for an abatement is governed by General Laws Chapter 59, which provides that the application for abatement must be filed within three months of assessment. G.L.c. 59, §59. If the abatement request is denied, the sewer user must then appeal to the Appellate Tax Board within three months of the decision to deny the abatement. G.L.c. 83, §16E; G.L.c. 59, §64.
In order to avoid frustrating the statutory scheme, the administrative procedure must be exhausted before the court can intercede. Gallo v. Division of Water Pollution Control, 374 Mass. 278, 288 (1978). This rule applies even if the plaintiff never initiated the administrative proceedings, and even where the administrative relief is no longer available. Id.
Accordingly, the only remedy available to the plaintiff would have been to file an application for an abatement with the Water and Sewer Department within three months of the date that the fee was originally due. Had the Water and Sewer Department denied the plaintiffs abatement application, the plaintiff would have been required to appeal to the Appellate Tax Board within three months of the denial. The plaintiff, however, did not pursue these administrative remedies, and instead chose to file a complaint with this Court almost seven years after its payment of the first disputed fee.
That the Town may not have recorded a certificate of its acceptance of G.L.c. 83, §16A, et seq. with the Registry of Deeds does not relieve the plaintiff of its obligation to comply with the abatement procedures because the plaintiff cannot show that it was prejudiced by this procedural defect. See Hallenborg v. Town Clerk of Billerica, 360 Mass. 513, 518 (1971) (“Considerations of fairness . . . suggest that amendments of zoning by-laws or ordinances ought not to be set aside lightly as invalid because of trivial procedural defects in their adoption at the behest of persons who have not shown themselves to be prejudiced significantly by the procedural deficiencies . . . Laches is an equitable defense that will bar a claim for damages where there has been unjustified, unreasonable, and prejudicial delay in raising a claim”); G.E.B. v. S.R.W., 422 Mass. 158, 166 (1996), quoting Srebnick v. Lo-Law Transit Management, Inc., 29 Mass.App.Ct. 45, 49 (1990).
In order to prevail on a defense of laches, the defendant must show: (1) that the plaintiff had knowledge of the alleged wrongdoing or failed to embrace an opportunity to ascertain facts, G.E.B., 422 Mass. at 166; quoting Stewart v. Finkelstone, 206 Mass. 28. 36 (1910); and (2) that the defendant suffered some injury or prejudice as a result of the plaintiffs failure to bring the claim earlier. Polaroid Corp. v. Travelers Indemnity Co., 414 Mass. 747, 759-60 (1993), citing Yetman v. Cambridge, 7 Mass.App.Ct. 700, 707 (1979).
The burden of proving that the portion of the Town’s Sewer User Fee that is attributable to line extensions is an unlawful tax, is on the plaintiff.
The Town’s characterization of the User Fee as a “fee” rather than a “tax” is entitled to judicial deference. Emerson College v. City of Boston, 391 Mass. 415, 423 (1984).
All valid user fees have these common traits which distinguish them from taxes: (1) They are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society; (2) the party paying the fee is using the service voluntarily, in that the party is free to reject the service; and (3) the charges are collected not to raise revenues but to compensate the governmental entity for providing the service. Emerson College, 391 Mass. at 424-25.
The Town’s user fee passes all three parts of the Emerson College test in that: (1) the user fee is only charged to those who use the Town’s sewer system, which does not service the entire town; (2) use of the sewer system is voluntary in that Anglo Fabrics had the option of building its own treatment plant, but chose to connect to the Town’s system; and (3) the charges are limited to what is necessary for the Town to recover its costs of operating the sewer system.
On the basis of the foregoing, this Court rules that the 1972 Agreement was effectively terminated by the Town of Webster by the adoption of the Sewer Use Charge System and Sewer Use Regulations in 1987.
ORDER FOR JUDGMENT
The Court ORDERS that judgment shall enter for the Town of Webster on Counts I, II, IV and V, without costs; Count III is waived by Anglo Fabrics and, therefore, DISMISSED as waived.